IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs February 9, 2016 at Nashville

**STATE OF TENNESSEE v. DELSHUN JONES**

**Appeal from the Criminal Court for Shelby County**
**No. 12-04777     Glenn Wright, Judge**

_____

**No. W2015-00156-CCA-R3-CD  -  Filed April 15, 2016**

_____

The defendant, Delshun Jones, was convicted by a Shelby County Criminal Court jury of first degree premeditated murder and sentenced to life imprisonment.  On appeal, he argues: (1) that the evidence is insufficient to sustain his conviction; (2) the State committed prosecutorial misconduct during voir dire and rebuttal closing argument; (3) the trial court erred in allowing testimony and evidence of cell phone records into evidence; and (4) the trial court erred in allowing an inmate to testify despite the inmate and the defendant's having a defacto attorney-client relationship.  After review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Sean H. Muizers (on appeal) and Leslie I. Ballin (at trial), Memphis, Tennessee, for the appellant, Delshun Jones.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Counsel; Amy P. Weirich, District Attorney General; and David M. Zak, Jr., and Rachel Russell, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The defendant was indicted for the first degree premeditated murder of the victim, Samuel Wilkes, Jr., arising out of his shooting the victim outside a birthday party on Easter Sunday, April 8, 2012.

The victim's father, Samuel Wilkes, Sr., received a call on April 8, 2012, that the victim had been shot and had died. Mr. Wilkes identified a photograph of the victim for the jury.

Bradley Delk testified that he was at a birthday party at a home on Merle Street in Memphis on April 8, 2012. Mr. Delk was in the front yard playing with some children when he heard five gunshots. The children ran into the house, and Mr. Delk looked down the street and saw a man in a white shirt, later learned to be the victim, fall to the ground. Mr. Delk recalled seeing a green car "pull[] up by the house" prior to the shooting and "[s]omebody from the back went to the car [and] spoke to the driver." Mr. Delk recalled that the defendant was the driver. On cross-examination, Mr. Delk stated that it was not Eric Velez or Marco Crawford who walked up to the green car and spoke with the defendant.

Izzah Kariem testified that on April 8, 2012, he was in the neighborhood playing basketball with friends when he saw a turquoise Nissan Altima or Maxima speed by two times, approximately seven or eight minutes apart. After he finished playing basketball, Mr. Kariem went inside his grandmother's house. As he entered the house, he heard gunshots and saw the turquoise car speed out of the neighborhood. On cross-examination, Mr. Kariem acknowledged that he could be heard on the tape recording of his 911 call describing the vehicle as light blue.

Ernestine Nelson, Mr. Kariem's grandmother, testified that she lived in the area of Kathy Road and Merle Street on April 8, 2012. She recalled that, on that day, she heard gunshots and called 911 because a young man had been shot. The victim lived two houses away from her, and Ms. Nelson had seen the victim walking in the neighborhood that day.

Ashlye Bowden testified that, on April 8, 2012, she was attending a birthday party at her cousin's house on Merle Street. Sometime that afternoon, a group of children ran inside and told them that someone was shooting. When Ms. Bowden walked outside, the shooting had stopped. Later that evening, around 11:00 p.m., Ms. Bowden, Eric Velez, and Tina Jones went with Ms. Bowden's brother, Marco Crawford, to Mr. Crawford's grandmother's house in Mr. Velez's truck. When they pulled up in front of the house, Mr. Crawford got out and went inside. While Mr. Crawford was inside, the defendant approached the truck and told them that he had shot the victim five times. Specifically, the defendant said, "I had to get him, bro. The nigga called my phone wolfing up at me

something about you know what I say – I stay. I caught him loafering. I told my nigga, lean back and popped his ass five times." The defendant said that the victim told him, "[N]igga, you know where I stay at." The defendant did not say why he shot the victim, only that the victim had called him and they had argued over the phone. Ms. Bowden stated that the defendant was bragging. The defendant told them that he felt sorry for the victim's mother, but "he could have got me first." Ms. Bowden did not contact the police that night because she was scared, but she did contact them later.

On cross-examination, Ms. Bowden recalled that she had previously seen the defendant around 3:30 p.m. that day, outside of the party in his car. She saw Marco Crawford have a conversation with the defendant. She heard the report of gunshots soon after Mr. Crawford returned to the backyard and she had gone inside. Ms. Bowden acknowledged that she did not call the police to report the defendant's confession until April 12. She said that, during that time period, she did not talk to Mr. Crawford, Mr. Velez, or Ms. Jones about what had happened.

Eric Velez testified that he was in the deejay booth at a party on Merle Street on April 8, 2012, when his girlfriend informed him that there had been a shooting. Later that night, around 11:00 p.m., he and Tina Jones, Ashlye Bowden, and Marco Crawford went to a house to buy marijuana. After Mr. Crawford got out of the truck and went to the door, the defendant walked up to the truck and told them what he had done. Mr. Velez recalled that the defendant said that "he rode up on him, got his attention. I guess he looked down. He let five shots go. Said he wanted to get out and continue I guess to shoot him. Basically like y'all have any problem he'll handle it." After reading his statement to the police to refresh his memory, Mr. Velez recalled that the defendant said that he wanted to mutilate and finish the victim. Mr. Velez said that the police contacted him about a week later.

Tina Jones testified that she had a birthday party for her son on April 8, 2012. She was standing on the porch when the defendant drove up and asked for Marco Crawford. The defendant and Mr. Crawford walked down the driveway, and Ms. Jones went inside the house. Sometime later, the children ran into the house and told her that someone was shooting outside. She went to the backyard and got Mr. Velez, and they ran to the front yard to investigate.

Ms. Jones stated that, later that night, she went with Mr. Velez, Ms. Bowden, and Mr. Crawford to Mr. Crawford's grandmother's house to buy marijuana. When they arrived, Mr. Crawford got out and went inside the house, and the defendant walked up to their truck. The defendant asked them what people were saying about the victim, and they told the defendant that they had heard the victim died. The defendant then told them, "When I seen [the victim] walk down the driveway and I hollered hey, and he bent

3

down and looked and I shot him." The defendant did not say why he shot the victim, but the defendant elaborated that "[h]e shot [the victim] four times and he wanted to stand over and keep shooting him." The police called Ms. Jones "a couple days" later. On cross-examination, Ms. Jones admitted that she and Mr. Velez discussed the incident a few times prior to the time she gave her statement to police. However, she maintained that she and Mr. Velez did not discuss what questions the police might ask them or what their answers would be.

Marco Crawford testified that he was acting as deejay at the birthday party for Mr. Velez's daughter on Easter Sunday of 2012. Mr. Crawford recalled seeing the defendant that day when the defendant pulled up to the house outside the party driving a green Nissan belonging to Mr. Crawford's cousin, Starkeisha Crawford. Mr. Crawford spoke to the defendant, and the defendant told him that he wanted to "get up" or "catch up" with the victim. Mr. Crawford told the defendant that "he had to do it on his own time whatever he [was] trying to do." When the defendant said that he wanted "to get" the victim, his tone was hostile. Mr. Crawford went back to the party, and he later learned from his children that gunshots had been fired. Mr. Crawford saw the defendant again later that night when he went to his grandmother's house to get marijuana with Mr. Velez, Ms. Jones, and his sister, Ms. Bowden. When he came back outside, the defendant was talking to the people he had ridden with to his grandmother's house.

Carl Allen, an inmate at the Shelby County Jail, testified that he served as a "jailhouse lawyer" by helping other inmates who need assistance with legal research. He elaborated that "the jail has a legal law machine. It's basically a laptop and I assist inmates that need assistance in doing legal research and things of that nature." He said that he earned money for his services. Mr. Allen said that the defendant was his former cellmate and asked Mr. Allen to assist him with some legal research and file a motion to dismiss. Mr. Allen told the defendant that it would cost him $30 for his services, and the defendant agreed and had his girlfriend, Starkeisha Crawford, put $30 on Mr. Allen's book once he finished the motion.

Mr. Allen testified that he told the defendant he would "have to be truthful in the facts that he gave [Mr. Allen]." The defendant told him that

> the case started or the incident happened on the day of the – on the evening of the murder. That [the victim] called the cell phone of his girlfriend's brother. And [the defendant] said he and his girlfriend's brother w[ere] together at that time. And he said that he answered the cell phone call from [the victim] who wanted to buy some marijuana from [the defendant]. He said that he and [the victim] talked on the phone for about a minute. And that [the victim] called him a bitch and hung up in his face. [The

4

defendant] told [Mr. Allen] that later on that evening at about five o'clock he was parked in front of a house in North Memphis at a birthday party. He said that he was driving a 2012 Altima. He said he never got out of the car and he was parked up the street from [the victim]'s house. He said that later on that evening . . . about six o'clock he saw [the victim] leaving walking down the sidewalk towards the birthday party.

[The defendant] said that when he saw [the victim] leaving, he drove down the street. He stopped the Altima even with [the victim] who had been stopped on the sidewalk and he said that he had a .40 caliber pistol pointed out of the driver's side window. And he said that he said to [the victim] who's the bitch now? And he started shooting him in the upper left side of his body and once in the ass.

. . . .

. . . [W]hen he drove up he said he already had a .40 caliber pistol in his hand pointed out the driver's side window. He said he said to [the victim] who's the bitch now and he started shooting him in the upper left side of his body and shot him once in -- he said he shot him a total of five times. He told me that after that he took the Altima and got it cleaned and detailed inside and out. And that he got rid of the gun. He also told me that later on that night that he told a friend of his that came over on Arrowhead [Road] to see him that he was the one that shot [the victim] because [the victim] had called him a bitch.

Mr. Allen testified that, when the defendant told him what happened, he did so in a bragging tone and "wasn't worried about the case to the degree that he felt like he would be convicted of it." Mr. Allen said that he did not indicate to the defendant that he practiced law or was a lawyer. Mr. Allen told the defendant that he was incarcerated for pending cases.

On cross-examination, Mr. Allen testified that he had acted as a jailhouse lawyer for about four years prior to meeting the defendant. Over the years, he had "worked with probably a 100 guys," each paying on average $30. However, "[he] wasn't doing this as a legal profession." Mr. Allen acknowledged that he sent a letter to the prosecutor offering to testify in this case, as well as against another inmate, in exchange for dismissal of several pending charges. However, he said that although he "hope[d] to get some type of leniency . . . as a result of coming forward," the prosecutor "ha[d] made it clear that there [were] no agreements in exchange for [his] testifying.

5

Officer Matthew Wells-Longshore with the Memphis Police Department testified that he issued the defendant a speeding ticket on November 14, 2011. The defendant was driving a silver 2003 Nissan Altima with a Tennessee license plate number of 101VWQ. The defendant gave Officer Wells-Longshore an address of 1727 National, Memphis, Tennessee, 38108 and phone number of 901-xxx-xxxx. Officer Wells-Longshore also responded to the scene of the shooting in the present case on April 8, 2012.

Officer Jeremy Knight with the Memphis Police Department testified that he responded to an incident call at 4159 Arrowhead Road on March 23, 2011. Officer Knight took a report from the defendant at that address, and the defendant gave him the same phone number he had given Officer Wells-Longshore.

Officer Christopher Slaughter, a crime scene officer with the Memphis Police Department, testified that he responded to the scene of the shooting on April 8, 2012. Officer Slaughter took photographs and collected evidence at the scene. He identified a diagram of the crime scene that was prepared by one of the other crime scene officers. Among the evidence recovered was a cell phone located near the victim's body.

Sergeant Robert Wilkie of the Memphis Police Department testified that he participated in the investigation of the victim's murder. He located a green Nissan Altima with license plate number 101VWQ and searched it with the consent of the owner. Sergeant Wilkie stated that he was present when Sergeant Eric Freeman interviewed the defendant and recalled that the defendant "denied knowing the victim, denied being in the neighborhood, ever being in the neighborhood, and also denied ever being in that car. Said that he didn't know anything about the homicide at all." The defendant told the officers that he did not know anyone who lived in the neighborhood where the shooting occurred. He also told the officers that the green Altima belonged to his girlfriend but that he had never driven the vehicle. The defendant told the officers that on the day of the shooting, he had gone to church and then stayed home the rest of the day. On cross-examination, Sergeant Wilkie stated that he did not find any evidence when he searched the green Altima.

Ethan Grossman, the custodian of records for Cricket Communications, identified the records for all of the incoming and outgoing calls pertaining to the cell phone number the defendant had given to Officers Wells-Longshore and Knight from April 8-9, 2012. Mr. Grossman said that the records reflected a number of calls made from the number the defendant had given the police officers on April 8, 2012, between 4:23 p.m. and 6:31 p.m. Mr. Grossman stated that they were also able to determine which cell towers routed the various calls. Doing so, they could pinpoint the direction the calls were coming from and received but could not pinpoint the exact locations of the phones. He said that he could not tell who actually made or received any of the calls, only the phone numbers.

6

Sergeant Eric Freeman of the Memphis Police Department testified concerning his investigation of the case. Sergeant Freeman took statements from Ashlye Bowden, Eric Velez, and Tina Jones, and all three picked the defendant out of a photographic array. During his investigation, he developed a possible phone number for the defendant and obtained search warrants for three cell phone numbers. He also located a green Nissan Altima with license plate number 101VWQ at a house that belonged to Starkeisha Crawford's mother. After receiving consent, he searched the vehicle and noted that it was extremely clean, as if it had recently been washed and deodorized. Sergeant Freeman spoke to the defendant at a later point in time, and the defendant denied being in the area of the shooting, driving the green Altima, or shooting the victim.

Dr. Karen Chancellor performed an autopsy of the victim. She determined that the victim had four separate gunshot wound injuries and that the cause of death was multiple gunshot wounds.

Connie Justice, who worked with the Memphis Police Department at the time of the offense, identified various photographs and diagrams of locations involved in the case.

James Davis, a forensic scientist with the Tennessee Bureau of Investigation Crime Laboratory, testified that the results of a gunshot residue kit from the victim were inconclusive.

The State then read two stipulations into the record. The first stipulation was that "the first 911 call made on April 8th of 2012 was made at 6:26:17 seconds." The second stipulation detailed several calls that were made back and forth among phone numbers belonging to Otis Ray, the victim, and the defendant on April 8, 2012, between 1:42 p.m. and 4:57 p.m.

The defense presented the testimony of Luther Farris, who testified that he lived in the neighborhood where the shooting took place and that, when he was outside on April 8, 2012, he heard several loud pops and saw a dark green SUV speed off around the corner. He told this information to the police on the night of April 8, 2012.

Following the conclusion of the proof, the jury convicted the defendant as charged of first degree premeditated murder.

## ANALYSIS

### I. Sufficiency of the Evidence

7

The defendant first argues that the evidence is insufficient to sustain his conviction, asserting that the State failed to prove his identity as the perpetrator or that the killing was intentional and premeditated. When the sufficiency of the evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 219 Tenn. 4, 11, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 212 Tenn. 464, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

The defendant was convicted of first degree murder, defined as "[a] premeditated and intentional killing of another[.]" Tenn. Code Ann. § 39-13-202(a)(1). "Premeditation" is defined in our criminal code as

an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order

8

to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

Whether premeditation exists in any particular case is a question of fact for the jury to determine based upon a consideration of all the evidence, including the circumstantial evidence surrounding the crime. See State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997); State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998). Our supreme court has listed a number of factors which, if present, may support the jury's inference of premeditation. Among these are the defendant's declaration of an intent to kill the victim; the use of a deadly weapon upon an unarmed victim; the establishment of a motive for the killing; the particular cruelty of the killing; the infliction of multiple wounds; the defendant's procurement of a weapon, preparations to conceal the crime, and destruction or secretion of evidence of the killing; and the defendant's calmness immediately after the killing. State v. Jackson, 173 S.W.3d 401, 409 (Tenn. 2005); State v. Thacker, 164 S.W.3d 208, 222 (Tenn. 2005); State v. Leach, 148 S.W.3d 42, 54 (Tenn. 2004); State v. Nichols, 24 S.W.3d 297, 302 (Tenn. 2000); Bland, 958 S.W.2d at 660.

We conclude that the evidence is sufficient to establish both the identity of the defendant as the shooter and that the killing was intentional and premeditated. As to the defendant's identity as the shooter, the defendant claims that the proof is insufficient because the murder weapon was never found, no forensic evidence linked him to the scene of the crime, and he denied being involved in the crime. However, several witnesses placed the defendant in the vicinity of the shooting and/or testified that the defendant admitted shooting the victim. Prior to the shooting, Bradley Delk saw the defendant pull up to the house where the birthday party was taking place, which was up the street from the scene of the shooting, in a green car, and someone from the party went and talked to him. Marco Crawford testified that the defendant pulled up to the house outside the party driving a green Nissan, and the defendant told him in a hostile tone that he wanted to "get up" or "catch up" with the victim. Izzah Kariem testified that he saw a turquoise Nissan Altima or Maxima speed through the neighborhood, both before and right after he heard gunshots. Ashlye Bowden, Eric Velez, Tina Jones, and Carl Allen all testified that the defendant admitted that he shot the victim. The credibility of these witnesses was heard and assessed by the jury as the trier of fact. Based on the proof offered by these witnesses, there was sufficient evidence for a rational trier of fact to find that the State sufficiently established the defendant's identity as the shooter.

As to the intentional and premeditated nature of the killing, in the light most favorable to the State, the evidence shows that the victim was unarmed, the defendant and

the victim were not engaged in an altercation or conversation immediately before the shooting, and the defendant came to the neighborhood looking for the victim. The defendant told Marco Crawford in a hostile tone just prior to the shooting that he wanted to "get up" with the victim. After the killing, the defendant fled the scene, disposed of the murder weapon, and thoroughly cleaned and detailed his car. Later that same day, the defendant bragged to several people that he had shot the victim. This proof is sufficient for a rational trier of fact to find that the killing was intentional and premeditated.

## II. Prosecutorial Misconduct

The defendant argues that the State committed prosecutorial misconduct by improperly defining reasonable doubt during voir dire and making improper comments during rebuttal closing argument.

When reviewing allegations of prosecutorial misconduct, this court must review the record to determine "whether such conduct could have affected the verdict to the prejudice of the defendant." State v. Smith, 803 S.W.2d 709, 710 (Tenn. Crim. App. 1990). "[P]rosecutorial misconduct does not amount to reversible error absent a showing that it has affected the outcome of the case to the prejudice of the defendant." State v. Reid, 164 S.W.3d 286, 321 (Tenn. 2005). In measuring the prejudicial impact of any misconduct, we consider the following factors: (1) the conduct viewed in light of the circumstances and facts in the case; (2) any curative measures taken by the trial court and the prosecution; (3) the prosecutor's intent in making the improper statements; (4) the cumulative effect of the prosecutor's statements and other errors in the record; and (5) the relative strength and weakness of the case. State v. Goltz, 111 S.W.3d 1, 5-6 (Tenn. Crim. App. 2003).

Tennessee courts "have traditionally provided counsel with a wide latitude of discretion in the content of their final argument" and trial judges with "wide discretion in control of the argument." State v. Zirkle, 910 S.W.2d 874, 888 (Tenn. Crim. App. 1995). However, a party's closing argument "must be temperate, predicated on evidence introduced during the trial, relevant to the issues being tried, and not otherwise improper under the facts or law." State v. Middlebrooks, 995 S.W.2d 550, 557 (Tenn. 1999).

The five generally recognized areas of prosecutorial misconduct in closing argument occur when the prosecutor intentionally misstates the evidence or misleads the jury on the inferences it may draw from the evidence; expresses his or her personal opinion on the evidence or the defendant's guilt; uses arguments calculated to inflame the passions or prejudices of the jury; diverts the jury from its duty to decide the case on the evidence by injecting issues broader than the guilt or innocence of the accused under the controlling law or by making predictions on the consequences of the jury's verdict; and

intentionally refers to or argues facts outside the record, other than those which are matters of common public knowledge. Goltz, 111 S.W.3d at 6.

The defendant first argues that the State made an improper statement to the potential jurors during voir dire when it discussed reasonable doubt. Specifically, the State discussed the standard of proof in layman terms as follows:

> The standard of proof. If you've ever watched the gazillion TV shows that are on all the time, you know that the standard of proof for a criminal case is beyond a reasonable doubt. And in your head you know what beyond a reasonable doubt means. But when you try to articulate it, it becomes really tough. Does everyone agree with that? Should I dare somebody to give me what beyond a reasonable doubt means to them? Is it a number? Is it something that they know? But you know it because you hear it and you think about it. And this is the best way to describe it. Okay. You're pretty sure that the person did it. Not to the certainty of 100 percent, but pretty sure. Because no other explanation makes sense. Is everyone okay with that[?]

The defendant asserts that the prosecutor's comment was an attempt to lessen the burden of proof. We cannot conclude that the prosecutor's discussion of the burden of proof constituted prosecutorial misconduct and, even if it amounted to error, such error was harmless in light of the trial court's subsequent correct and complete charge to the jury.

In charging the jury, the trial court stated, "Statements, arguments and remarks of counsel are intended to help you in understanding the evidence and applying the law, but they are not evidence. If any statements were made that you believe are not supported by the evidence, you should disregard them." The trial court further instructed the jury on reasonable doubt:

> Reason[able] doubt is that doubt created by an investigation of all proof in the case and an inability, after such investigation, to let the mind rest easily upon the certainty of guilt. Absolute certainty of guilt is not demanded by the law to convict of any criminal charge, but moral certainty is required and this certainty is required as to every element of proof needed to constitute the offense.

Even if the prosecutor erred in his explanation of reasonable doubt, the trial court gave the jury correct instructions, and jurors are presumed to follow the instructions of the trial court.

11

The defendant also argues that the State committed prosecutorial misconduct by making improper comments during rebuttal closing argument. The defendant points to the following comments as improper: (1) when the prosecutor told the jury that "[a] prosecutor's wors[t] nightmare is to convict someone not guilty"; and (2) when the prosecutor stated that defense counsel's statements about "[w]ho you would trust your children with, who you would trust your bank statement with, who you would trust your house with, has nothing to do with if you believe the defendant is guilty or not." We determine that the first comment was in conjunction with a discussion concerning the importance of the jury's role and the functions of the prosecutor and defense counsel. The second comment was proper rebuttal to defense counsel's remarks that the State's witnesses could not be trusted. In any event, even if either of these statements was in error, they could not have affected the verdict to the prejudice of the defendant.

### III. Cell Phone Records

The defendant next argues that the trial court erred in allowing testimony and evidence of cell phone records into evidence because the records were obtained with a defective warrant in that the warrant did not possess a time stamp for the date of issuance as required by Tennessee Rule of Criminal Procedure 41. The State responds that the warrant was issued pursuant to 18 U.S.C. § 2703 and, therefore, Tennessee Code Annotated section 40-6-110 and Tennessee Rule of Criminal Procedure 41 are inapplicable. Initially, we are not persuaded by the State's argument because 18 U.S.C. § 2703 states that the warrant must be "issued using the procedures described in the Federal Rules of Criminal Procedure (or, in the case of a State court, issued using State warrant procedures) by a court of competent jurisdiction." 18 U.S.C. § 2703(a). Thus, State warrant procedures were still applicable.

"No law enforcement officer shall search, examine, extract or duplicate any cellular telephone data, even if incident to a lawful arrest, unless . . . [t]he officer has obtained a search warrant issued pursuant to this part or Rule 41 of the Tennessee Rules of Criminal Procedure[.]" Tenn. Code Ann. § 40-6-110(b)(1). Moreover, "[n]o cellular telephone data that is obtained in violation of this section may be used in any court of law or administrative board as evidence, nor may other evidence that is derived from the illegally obtained data be used as evidence in any such proceeding." Id. § 40-6-110(c). Rule 41(c) of the Tennessee Rules of Criminal Procedure provides, in pertinent part: "If the magistrate is satisfied that there is probable cause to believe that grounds for the application exist, the magistrate shall . . . . endorse on the search warrant the hour, date, and name of the officer to whom the warrant was delivered for execution." Tenn. R. Crim. P. 41(c)(3)(D).

The Exclusionary Rule Reform Act, "ERRA," enacted on July 1, 2011, "provides a statutory good faith exception for the failure to comply with technical statutory and procedural rules regarding the issuance of warrants." State v. Lemaricus Devall Davidson, No. E2013-00394-CCA-R3–DD, 2015 WL 1087126, at *14 n.8 (Tenn. Crim. App. Mar. 10, 2015). Specifically, the Act states as follows:

> Notwithstanding any law to the contrary, any evidence that is seized as a result of executing a search warrant issued pursuant to this part or pursuant to Tennessee Rules of Criminal Procedure Rule 41 that is otherwise admissible in a criminal proceeding and not in violation of the constitution of the United States or Tennessee shall not be suppressed as a result of any violation of this part or any violation of the Tennessee Rules of Criminal Procedure Rule 41 if the court determines that such violation was a result of a good faith mistake or technical violation made by a law enforcement officer, court official, or the issuing magistrate as defined in subsection (c).

Tenn. Code Ann. § 40-6-108(a). A "'good faith mistake or technical violation'" is defined as "[a]n unintentional clerical error or clerical omission made by a law enforcement officer, court official or issuing magistrate in the form, preparation, issuance, filing and handling of copies, or return and inventory of a search warrant[.]" Id. § 40-6-108(c)(1).

At trial, the defendant argued for exclusion of the cell phone record evidence because the warrant did not contain the time of issuance as required by Tennessee Rule of Criminal Procedure 41 and therefore was not in compliance with Tennessee Code Annotated section 40-6-110. The defense argued that, although section 40-6-110 had only gone into effect in July 2014 – a few months before trial, it was a procedural statute that could be applied retroactively. The State agreed that the law could be applied retroactively but argued that the Exclusionary Rule Reform Act, Tennessee Code Annotated section 40-6-108, which went into effect in July 2011, recognized a good faith exception to exclusion for mistakes or technical violations. The defense countered that the good faith exception should not apply because the more recent statute, Tennessee Code Annotated section 40-6-110, provided for exclusion if Tennessee Rule of Criminal Procedure 41 was not complied with and was therefore controlling.

In denying the defendant's motion to suppress, the trial court noted that it had reviewed all of the applicable statutes and case law submitted by the parties, "[n]one of which [it] found to be exactly on point." The court stated that it "considered unfair prejudice to the defendant[,] . . . the purpose and intent of the law and the rule in

13

question, and I find that the failure to include a time that the warrant was issued does not, under the facts of this particular case, invalidate the warrant."

We determine that we need not consider whether the good faith exception should apply because even if the cell phone record evidence was admitted in error, any error was harmless. The only evidence elicited at trial regarding the cell phone records was through Ethan Grossman, the custodian of records for Cricket Communications, who testified when calls were made to and from various phone numbers, as well as the probable directions the calls were coming from and received. Mr. Grossman never testified about the contents of any call or text message. The primary evidence against the defendant came from witness testimony that the defendant was in the area of the shooting and admitted to killing the victim. The fact that calls were made among the defendant, the victim, and another individual was merely auxiliary to the other evidence. Therefore, even if trial court erred, we cannot conclude that it "more probably than not affected the judgment or would result in prejudice to the judicial process." See Tenn. R. App. P. 36(b).

## IV. Attorney-Client Privilege

The defendant lastly argues that the trial court erred in allowing an inmate, Carl Allen, to testify despite Mr. Allen and the defendant having a defacto attorney-client relationship. The defendant asserts that Mr. Allen performed legal research and drafted a motion to dismiss for him, in exchange for a fee of $30 paid upon completion of the motion. Mr. Allen told him that he needed to know the facts of the case and that he could only be helpful to the extent the defendant was truthful with him regarding the facts. The defendant argues that Mr. Allen's behavior "is exactly how a licensed attorney would approach their representation of a criminal client."

Tennessee Code Annotated section 23-3-105 codifies the attorney-client privilege:

> No attorney, solicitor or counselor shall be permitted, in giving testimony against a client or person who consulted the attorney, solicitor or counselor professionally, to disclose any communication made to the attorney, solicitor or counselor as such by such person during the pendency of the suit, before or afterward, to the person's injury.

The attorney-client privilege "serves the administration of justice by encouraging full and frank communication between clients and their attorneys by sheltering these communications from compulsory disclosure." Boyd v. Comdata Network, Inc., 88 S.W.3d 203, 212 (Tenn. Ct. App. 2002). However, the privilege only protects communications regarding the subject matter of representation "made with the intention

14

that the communication be kept confidential." State ex rel. Flowers v. Tenn. Trucking Ass'n Self Ins. Grp. Trust, 209 S.W.3d 602, 616 (Tenn. Ct. App. 2006) (citing Tenn. Code Ann. § 23-3-105).

In this case, Carl Allen, an inmate in the Shelby County Jail, assisted other inmates in filing motions. He was not an attorney, and he did not tell the defendant he was an attorney. The communication between the defendant and Mr. Allen was not privileged, and Mr. Allen was properly allowed to testify to the statement the defendant made to him. There is simply no precedent for extending the attorney-client privilege to communications between a defendant and someone who is not actually an attorney. To hold otherwise would open the floodgates for the assertion of the privilege and minimize the importance of a true attorney-client relationship.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgment of the trial court.

_____
ALAN E. GLENN, JUDGE